[Cite as *Williams v. Dept. of Rehab. & Corr.*, 2018-Ohio-1721.]

| | |
|---|---|
| NATHANIEL WILLIAMS, ADMR., etc. | Case No. 2016-00125JD |
| Plaintiff | Magistrate Robert Van Schoyck |
| v. | DECISION OF THE MAGISTRATE |
| OHIO DEPARTMENT OF REHABILITATION AND CORRECTION | |
| Defendant | |

{¶1} This action arises from the death of Na'Tuan Williams, who had been an inmate in defendant's custody, resulting from an altercation with fellow inmate Carl Hall at Ross Correctional Institution (RCI) on June 27, 2011. Plaintiff, the administrator of Williams' estate, brings this action for wrongful death and survivorship. The issues of liability and damages were bifurcated and the case proceeded to trial on the issue of liability.

**SUMMARY OF TESTIMONY**

{¶2} Inmate Carl Hall testified by way of deposition.[1] (Defendant's Exhibit K.) Describing the circumstances leading up to the fatal altercation, Hall explained that a month or two earlier, corrections officers confiscated some bootleg wine, known as hooch, from Williams. Williams blamed him for the loss of the hooch, Hall stated, accusing him of having "snitched" to the officers. Hall testified that he and Williams and others in their housing unit gathered in a cell one day and talked about the dispute and after he denied Williams' accusations, a scuffle broke out between the two. According to Hall, Williams rammed his head into a bedpost and split it open and left lacerations and bruises on his back and neck. Hall testified that corrections officers subsequently asked him how he got injured but he did not tell them. Hall stated that he was taken to

---

[1]The objections in the deposition transcript at pages 21, 36, 51-54, and 57-58 are OVERRULED.

the infirmary for treatment and was then placed in the segregation unit. Hall related that Williams was also placed in segregation, as was inmate Antoine Davis, who witnessed the scuffle and lived in the cell where it occurred. As Hall related, there was an investigation in which corrections staff sought to determine the underlying facts, but he considered the dispute to be over and he told the staff nothing. Hall also related that in prison culture, inmates who divulge information to authorities are considered snitches and put themselves at risk of reprisal.

{¶3} Hall stated that when he and Williams were eventually released from segregation, they were placed in separate housing units, whereas before they only lived two or three cells apart in the same housing unit. As Hall described, however, he still saw Williams in the chow hall and Williams persisted in making threatening statements and gestures. Hall recounted that Williams insisted that Hall pay him to settle the matter and had friends deliver Hall notes a couple of times setting forth Williams' demands, including a note that Hall received at a church service demanding "30 coffees and 30 dollars."

{¶4} Hall stated that there was a schedule for when inmates from the various housing units could visit the north recreation yard and he watched the schedule so as to avoid seeing Williams there. Hall, who explained that he had been in prison since 1992 on aggravated murder and kidnapping convictions, testified that he wanted to avoid any trouble because he had an upcoming hearing before the Parole Board. Hall stated that he did not expect Williams to be in the north recreation yard on June 27, 2011, but that Williams ended up being there and approached him, making threatening gestures. Hall testified that he told Williams he did not want any trouble and to let the matter go, at which point Williams said "I'll be back." Hall stated that the nearest corrections officer was at the north tie shack near the gate, 60 to 70 yards away. When Williams returned shortly thereafter, Hall stated, Williams was wearing gloves and had a group of friends around. Hall recounted that Williams took a swing at him and they began to fight.

According to Hall, a weapon appeared and he picked it up off the ground and stabbed Williams in what he considered a self-defensive measure. Hall testified that when corrections officers intervened the weapon was on the ground again and he picked it up and tried to throw it over a fence so that Williams' friends could not pick it up and stab him.

{¶5} Hall stated that he does not know where the weapon, a metal shank, came from. When asked about plastic strips that were tied around his wrist at the time, Hall denied that they were for securing the weapon and explained that he had a habit of making the strips from garbage bags and keeping them handy to use as closures for bags of snacks. Hall stated that he must eat frequently because he had stomach cancer and underwent a full surgical removal of the stomach. Hall stated that he was initially convicted of murder and sentenced to life without parole for the killing, but the conviction was vacated and he ultimately pleaded guilty to voluntary manslaughter and a weapon charge.

{¶6} Inmate James Bliss testified by way of deposition.[2] (Defendant's Exhibit L.) Bliss stated that he had been at RCI since 2004 and had known Hall for 2 or 3 years, and that he did not know Hall to be violent. Bliss stated that he did not know much about Williams, whom he described as younger and bigger than Hall. When asked if he heard any inmates talk to corrections officers about problems between Hall and Williams, Bliss replied that he had not and that inmates generally do not discuss such things with officers. According to Bliss, Hall seemed worried on the morning of June 27, 2011. Bliss testified that when the yard was opened for recreation, he was preparing to run on the track when the altercation began nearby on the basketball court. Bliss related that he saw Williams come up and take a swing at Hall, who put his hands up and backed away. As Bliss described, several inmates who knew Williams stood

---

[2]The objections in the deposition transcript at pages 13, 32, 36, 42, 59/lines 20 & 23, 60, and 76 are OVERRULED; the objections at pages 38, 59/line 3, 63, and 65 are SUSTAINED.

around and egged him on, whereas Hall had no support, and Williams was positioned between Hall and the north tie shack. According to Bliss, Williams started beating Hall up, took him to the ground, and got on top of him. Bliss stated that Hall then apparently stabbed Williams, at which point Williams restrained Hall on the ground. Williams yelled out "he got a knife" at some point, Bliss stated, but he did not realize Williams had been stabbed until he saw blood and he did not see the weapon until Hall threw it out of the area. Bliss testified that there had been no corrections officers nearby, but they came running once an alarm was called. Bliss recalled officers clearing inmates out of the yard and a lieutenant trying to aid Williams. Regarding pat searches of inmates entering the yard, Bliss stated that these were infrequent in his experience, but that inmates were subject to search at any time.

{¶7} Inmate Baretta Wilford testified by way of deposition.[3] (Defendant's Exhibit M.) Wilford, who stated that he has been in prison since 1993, testified that he was friendly with both Williams and Hall, but was closer to Williams. Wilford explained that he ran a kind of underground store where inmates could purchase commissary items during times when they could not visit the actual commissary, and Williams worked as the "muscle" in this enterprise. In terms of problems between Williams and Hall, Wilford recounted a time when Hall had some hooch for sale and Williams wanted to make a purchase on credit, but Hall would not allow it. Wilford also described a subsequent time when corrections officers confiscated hooch from Williams, which Williams believed resulted from Hall tipping off the officers. Wilford testified that Williams and Hall later got into a fight in the cell next to his, and when he was alerted to it he went and broke it up. Williams had no visible injuries, but Hall's head was split open, Wilford stated. According to Wilford, he took Hall into his cell and cleaned him up, at which point a corrections officer came by and saw Hall's injury. Wilford testified, though, that he told

---

[3]The objections in the deposition transcript at pages 25-28, 30, 32, 36, 38/line 6, and 41 are OVERRULED; the objections at pages 21, 35, 38/lines 18 & 23, 39, and 42 are SUSTAINED.

the officer nothing about what happened other than to say that no weapon had been involved.

{¶8} Wilford recalled that Hall was taken to the infirmary and then put in segregation, and later Williams was put in segregation as well. Wilford testified that when Williams and Hall were released from segregation, they were separated into different housing units but there still would have been opportunities to see one another in the chow hall or chapel. According to Wilford, he spoke to both men around that time and tried to dissuade Williams from the idea that Hall had snitched against him, but Williams persisted in his belief and demanded that Hall pay him 10 bags of coffee, which "in penitentiary money, equals $30." Wilford stated that he never knew Hall to attack anyone or carry a weapon and he never heard Hall threaten Williams, but he understood that Hall had some property stolen from him during this time and was tired of being messed with. Wilford also stated that Williams was stronger than Hall and that it was apparent Hall had some health problems. Neither man expressed any desire to him to be separated from the other any more than they already were, according to Wilford.

{¶9} Inmate Leonard Allen testified by way of deposition.[4] (Defendant's Exhibit N.) As Allen related, he knew both men, meeting Hall in 2004 at Warren Correctional Institution and meeting Williams in about 2007 at the Southern Ohio Correctional Facility. Williams was younger and bigger than Hall, who had some health problems, Allen stated. Allen described efforts he and inmate Damon Edwards made to defuse the conflict between Williams and Hall after the initial altercation. Allen stated that he advised Williams to let it go, but Williams insisted that Hall pay him. Allen stated that he never heard Williams threaten Hall, though. According to Allen, a pair of headphones was stolen from Hall amidst the dispute and Hall felt that Williams was involved and he

---

[4]The objections in the deposition transcript at pages 12, 21, 23, and 25-26 are OVERRULED; the objections at pages 18-19 are SUSTAINED.

wanted the headphones back. Allen stated that in his experience when inmates were in a serious fight and came before the Rules Infraction Board, they were routinely separated onto opposite sides of RCI. Allen stated that neither man here expressed to him a desire to be further separated from the other. Allen stated that he understood Edwards to be someone who furnished shanks for others but that he has no personal knowledge about Hall getting a weapon from anyone, and he also noted that Edwards was on good terms with Williams.

{¶10} Inmate Damon Edwards testified by way of deposition.[5] (Defendant's Exhibit O.) Edwards stated that he first met Hall at Warren Correctional Institution in 1996, but only remembered speaking to Williams once. Edwards recalled that he and Allen talked to Hall about the dispute with Williams. Hall had a parole hearing coming up and just wanted Williams to leave him alone after the initial altercation, Edwards recalled, and Hall wanted Edwards and Allen to talk to Williams on his behalf. According to Edwards, some property was stolen from Hall but to his knowledge Hall did not blame Williams. Edwards stated that he never knew Hall to be violent or to carry a weapon, and for his part Edwards strongly denied any involvement in making or supplying weapons for others.

{¶11} Lieutenant Joey Powers testified that he has been employed by defendant at RCI since 1993. Powers stated that he received two or three months of training at defendant's academy when he was hired and that he has continued to receive training since that time, including on topics such as conducting investigations, managing inmates, and identifying threats. Powers stated that he serves as a supervisor of corrections officers and has the authority to initiate investigations and deploy staff as needed to assist with investigations.

{¶12} According to Powers, on May 24, 2011, he was making rounds through Williams and Hall's housing unit when a corrections officer told him something was

---

[5]The objections in the deposition transcript at pages 11-12 are OVERRULED.

wrong with Hall and that Hall claimed to have injured himself. Powers stated that he spoke to Hall, who gave a story about injuring himself that was slightly different than what the officer related, so he decided to investigate. Powers related that Hall received a medical examination from a nurse and was then placed in security control within the segregation unit for his own safety. Because he could not reasonably conclude at that time that the injury was anything other than accidental, Powers stated, he did not prepare an incident report, but he would have made and kept notes about what Hall and the officer told him. Powers allowed at one point in his testimony that at least under the language of a later version of defendant's policy on Incident Reporting and Notification, an incident report should have been prepared, but later he stated that it was not necessary. In any event, Powers stated, he at least prepared a Report of Security Control (Plaintiff's Exhibit 19-15) which was forwarded to the warden or his designee together with the medical examination report and a suicide questionnaire. Powers testified that it is standard at the end of one's shift to let the supervisors coming on shift know what transpired recently and what to be on the lookout for, and that at the end of his shift that day, he informed a lieutenant that Hall was in security control on suspicion that he may have been injured in an altercation.

{¶13} Powers stated that documents show that the next day, May 25, 2011, another staff member placed inmate Antoine Davis in security control in connection with the investigation, and on May 26, 2011, then-Lieutenant Michael Yates did the same with Williams. (Plaintiff's Exhibit 12.) Powers testified that he met privately with Davis, Hall, and Williams multiple times in the segregation unit and also spoke to others, including cellmates, and aside from what Hall said about slipping and falling, they all claimed that they saw nothing and knew nothing. Powers described a code among inmates, especially older inmates like Hall, to not snitch on one another. Powers recounted that when he met with Williams, Williams claimed that he did not know Hall or

mess with Hall. Powers stated that he also spoke to the corrections officers who worked in the housing unit where Davis, Hall, and Williams lived.

{¶14} As Powers explained, he kept Hall in security control in the segregation unit for the seven days that he was initially limited to, and he was able to obtain a seven-day extension, but after the two weeks were up he had not been able to get any meaningful information. Powers testified that he did not have information to support citing anyone for a rules infraction, but that as a precaution he had the count office place Williams and Hall into different housing units, with Davis going back to their original unit, so that in case there was some dispute at least they would not be living in close proximity. Powers related that inmates can be subjected to a more formal local separation at RCI, placing one on the north side and one on the south side of the compound, and that while inmates can also be separated into different institutions, that requires the warden's approval and the facts must demonstrate just cause. Powers also stated that inmates can request to be separated from others and can also request to be placed in protective control if they fear for their safety, but Hall and Williams were asked about it and both declined.

{¶15} When the fatal altercation occurred, Powers stated, he was in the captain's office and heard a call for assistance over the radio. Powers recalled that Corrections Officers John Cox and Darwin Secrest were at the scene when he arrived, and although he was one of the first responders, the altercation was over. Powers recalled helping secure Hall, who was on the ground and compliant with orders from Secrest, who had a canister of OC spray pointed at Hall, and he heard Cox announce he had secured the weapon. Powers testified that Williams screamed for help and staff members tried to render aid. Powers described trying to maintain control of the scene, having inmates back away but not leave. Powers stated that he handcuffed Hall and saw some string or tape around Hall's wrist, and that he escorted Hall to the infirmary. According to

Powers, Hall told him to recover a note from his cell that Williams supposedly sent him. Powers stated that after Hall left the infirmary, he was placed in segregation.

{¶16} Captain Michael Yates testified that he has been employed with defendant since 1995 and that at the time of the incident he held the rank of lieutenant, mostly working the second shift. Yates recalled being informed by Powers in May 2011 that Hall had a head injury and that it was unknown whether Hall fell or was in an altercation. Yates related that the investigation into Hall's injury was conducted by Powers, not himself, and that it is very rare for inmates to inform on one another, but that he did learn from an inmate that Williams and Hall had an argument. Yates stated that he therefore put Williams under security control in the segregation unit because he felt it was relevant to Powers' investigation and he shared the information he obtained with Powers. Yates stated that he was familiar with Williams, whom he described as a big kid who had not learned "how to do his time" and was always close to getting in trouble, although he had never put Williams in segregation before. Yates' testimony included a description of the manner in which corrections officers would monitor the recreation yard, and he also described how the RCI administration oversaw efforts to investigate and locate weapons through shakedowns and otherwise. Yates explained how investigators at RCI tracked weapons data and would alert staff at times to look out for certain kinds of weapons.

{¶17} Robert Jeffreys stated that he is employed by defendant as a regional director, but that at the time of the incident he served as warden of RCI. Jeffreys testified that Hall's head injury in May 2011 was not something he would typically have known about and indeed he had not been aware of it. Jeffreys stated that the Report of Security Control documenting Hall being placed in security control pending Powers' investigation was signed as received by his designee, Deputy Warden Jeffrey Lisath, who oversaw operations, unit management, maintenance, recreation, and security. (Plaintiff's Exhibit 19-15.) Jeffreys described the protective control policy that was

available for inmates who were in fear for their safety, but he also stated that it was common for inmates to deny being in fear of anyone.

{¶18} Jeffreys testified that RCI was populated by level three offenders and it was part of the culture that many inmates wanted to possess shanks because they felt unsafe or otherwise. Jeffreys recounted that officials at RCI tracked weapons confiscations and that the number of weapons found was high in his opinion. (Plaintiff's Exhibit 19-9.) Jeffreys described the practices that were employed to look for weapons, including policies for shaking down cells and conducting random pat searches of inmates throughout the first and second shifts, and subjecting those leaving the maintenance shop to metal detectors. Shown a photograph of the shank used in the fatal altercation, Jeffreys testified that he has not seen another that looks like it and he does not recognize where the metal came from. (Defendant's Exhibit F.) Jeffreys was asked whether he was aware inmates had made weapons from metal taken out of fluorescent light fixtures, and he stated that he was and that the maintenance department had been considering a solution. Jeffreys explained that maintenance staff could perform routine maintenance on light fixtures that were in need of repair, but that hiring a contractor to replace all the light fixtures would have constituted a capital improvement that had to go through a high-level process to accomplish rather than being something he could just order as warden.

{¶19} Jeffreys authenticated a copy of the post orders for the north and south tie shack security posts, which set forth the policies and procedures applicable to the corrections officers working at those locations. (Plaintiff's Exhibit 19-3.) As Jeffreys related, the post orders provide, among other things, that officers stationed there during the first and second shifts were to perform a pat search of a minimum of six inmates entering or exiting their area, and that in addition to serving as the access point for inmates going to recreation, the tie areas were also where authorized inmates holding passes would go from their housing units to other locations beyond the gate, where the

officer was responsible for checking their passes. Jeffreys also explained what a pat search entails, as set forth in the General Post Information applicable to corrections officers at any security post. (Plaintiff's Exhibit 19-2.) Jeffreys authenticated a copy of the post orders for corrections officers assigned to recreation duty, which required, among other things, conducting security checks at staggered intervals not to exceed 30 minutes and searching common areas as time permitted. (Plaintiff's Exhibit 19-4.) These post orders also set forth the only items that inmates were permitted to bring to recreation. According to Jeffreys, officers in or around the north recreation yard would include the north tie shack officer, two yard officers, and a recreation officer.

{¶20} Jeffrey Lisath, now retired, testified that in 2011 he was employed with defendant as deputy warden of operations at RCI. Lisath testified about certain departmental policies, including the policy on protective control, described in the General Post Information as "[a] status for the purpose of protecting those inmates who face a significant and verified risk of harm from a specific person, other inmate, or group of inmates." (Plaintiff's Exhibit 19-2.) Lisath testified that an inmate who feels his life is in danger could go to staff and request protective control, or staff could initiate the process as well, and either way the inmate would then be placed in segregation, an investigation would be conducted, and a committee would review the case and make a recommendation to the warden as to whether protective control is warranted.

{¶21} Regarding the Inmate Separations policy (Plaintiff's Exhibit 19-7), Lisath explained that there are two formal types of separation, local and institutional. Whereas institutional separation means two or more inmates cannot be in the same facility, Lisath stated, local separation means two or more inmates must be in separate housing units or on opposite sides of a compound. Lisath recalled, and the policy provides, that local separation may be ordered by the warden upon the recommendation of the Rules Infraction Board, and he stated that in rare cases the recommendation may just come from a supervisor. In the case of one of these local separation orders at RCI, Lisath

stated, inmates might still see one another at the chapel or commissary, or, depending on the degree of separation ordered, in some cases they might still be able to go to recreation at the same time.

{¶22} Lisath described the Inmate Security Classification policy (Plaintiff's Exhibit 19-6), explaining the variables that go into determining an inmate's security level, such as time served, the nature of the offense, gang affiliation, a psychological review, and other factors, and he explained how a security level is different than a privilege level. Lisath was questioned about past disciplinary infractions by Hall at RCI but stated that those shown to him at trial were relatively minor infractions that he would not have dealt with and that he never had occasion to review Hall's history. Lisath testified that he received and signed the Report of Security Control that Powers prepared when putting Hall under security control pending the investigation into Hall's injury in May 2011. Lisath explained that he or his designee would sign such reports and then a copy would go to the warden's office, together with a suicide questionnaire and any medical examination report and conduct report. Lisath testified that when an inmate was placed under security control pending an investigation, if no evidence was obtained the inmate was typically released back into the general population. Looking at the Individual Segregation Record Sheets that documented the time Hall spent under security control, Lisath testified that he would have been aware that Williams and Hall were released into different housing units afterward. Lisath stated, however, that he does not recall having any other information about them nor anyone recommending a formal institutional or local separation of them.

{¶23} Lisath testified that he does not know where the weapon used in the fatal altercation came from and to his knowledge the source was never determined. Lisath recounted that shanks come in many shapes and sizes and this was not a commonly-seen type. Lisath was asked about shanks being made from metal taken out of light fixtures and he testified that he was aware of some being found and that he recalls

some discussions with the maintenance department to consider replacing light fixtures, but he stated that any specific plan like that had to be approved by the warden and he cannot recall if it got to that stage. Lisath stated that as far as he could recall, those discussions were part of meetings he had with RCI officials where they more broadly discussed weapons and strategies to reduce the number of them. Lisath testified about how corrections officers were responsible for doing shakedowns and looking for weapons every day and how RCI kept data to track weapon confiscations. (Plaintiff's Exhibit 19-9.)

{¶24} David Baker, now retired, testified that he was employed by defendant as the Investigator at RCI for 20 years, including at the time of the incident, following a 25-year career with the Ohio State Highway Patrol, from which he retired as a lieutenant and gained extensive experience and training in evidence gathering and investigative techniques. Baker testified that he investigated cases at RCI as assigned by the warden and also served as a liaison to the Ohio State Highway Patrol. Baker stated that his investigations mostly pertained to felony-level matters, while relatively minor infractions were handled by correctional or unit staff. Baker recalled seeing Hall earlier in 2011 about a relatively minor altercation that left a cut on his head. Baker stated that pictures were taken and the matter was referred to the Ohio State Highway Patrol, which deemed the injuries minor and elected not to pursue it, and it was left up to unit staff to address.

{¶25} Baker testified that he arrived at the scene of the fatal altercation at approximately 8:27 a.m., at which time Hall was in handcuffs and the scene was secured, and he started making notes and taking pictures. Baker stated that he believes the weapon was made from part of a window frame but that this was just an educated guess. Baker stated that he monitored weapons confiscations and kept data that was reported to management regularly, and from time to time weapons were

addressed at weekly executive meetings, but that it could not always be determined where weapons came from.

{¶26} Baker testified that he went to photograph and speak with Hall in the segregation unit with investigators from the Ohio State Highway Patrol, and although he did not see plastic on Hall's wrist he saw plastic on the floor which was gathered as evidence. Baker stated that Hall would not give a statement. But, Baker stated, because Powers informed him that Hall had indicated earlier that there was a note in a particular place in his cell, he and the Ohio State Highway Patrol investigators went to Hall's cell and a trooper recovered the note. (Plaintiff's Exhibit 16, which appears to state: "Look here we can put this shit behind us all I want is 30 bucks 13 coffee's. You done fuck my Bid up and I lost to much out of this I need to get back on my feet OR we can get it Back popin It's on you I don't have shit to lose. I ain't got nothing else to talk about.")

{¶27} Corrections Officer Darwin Secrest testified that he has been employed with defendant at RCI for over 23 years and that in 2011 he worked as a relief officer on the first shift wherever he was needed. Secrest testified that he was familiar with Williams and Hall but knew of no problems between them. From what Secrest remembered, Hall's demeanor was about average for inmates at RCI, but Williams stood out as one who was very forceful and liked to "push his weight around."

{¶28} Secrest testified that on the morning of the fatal altercation, his role was that of a recreation officer. In addition to him, there were two yard officers patrolling somewhere outside the fenced-in recreation area and Corrections Officer Cox was posted at the north tie shack, from which one could see most of the yard, Secrest stated, and there was a rotating camera in the yard as well. Secrest related that he was opening up the gymnasium for inmates to use just after recreation had begun when he heard Cox call over the radio that there was a fight, so he immediately ran to the scene which was about 45 yards away. According to Secrest, he was the first staff member to

get there and after he issued verbal commands to both inmates to stop fighting, he saw Hall remove tape from his wrist and throw the weapon, which seemed to have been secured to Hall's wrist with the tape. Secrest stated that both inmates were covered in blood and it was a chaotic scene but he could tell that Williams was badly injured. Hall laid down and put his hands up in compliance with Secrest's orders, he stated, and he was prepared to deploy a chemical agent upon Hall if he moved, and then other responders arrived and secured Hall. Secrest testified that after calling for medical attention, he stayed with Williams and rendered first aid until Lieutenant Hall took over.

{¶29} Shown a photograph of the weapon, Secrest testified that he has seen many different shanks over the years but did not recognize this model and could not say what it was made from. (Defendant's Exhibit F.) Secrest recounted that supervisors periodically brief the staff to look for certain types of weapons and that he reviews a monthly weapons report for RCI. Secrest also stated that officers routinely checked the recreation yard every morning to look for metal or other foreign objects.

{¶30} Corrections Officer John Cox, now deceased, testified by way of deposition.[6] (Plaintiff's Exhibit 29). Cox, who stated that he had been employed by defendant since 1991 and worked at RCI since 1993, also stated that he received 40 hours of training annually on a variety of topics. Cox explained that his normal post was working the first shift at the north tie shack. Cox related that there was a small structure there where he worked alone and he characterized this as a place where inmates would leave their housing units in the north part of RCI and cross through a gate to go to other places such as the chapel, infirmary, barbershop, commissary, library, school, or captain's office. Cox explained that part of his job was to control the gate and stop inmates who were headed to those places to make sure that they had passes allowing them to visit.

---

[6]The objections in the deposition transcript at pages 9, 32, 57, and 89 are OVERRULED; the objection at page 67 is SUSTAINED.

{¶31} Cox also explained that the gate was where inmates living in the north part of RCI accessed the north recreation yard, which did not require a pass but was based on a schedule divided up by housing units. The way Cox described, when the recreation yard opened up he would call the corrections officers in the housing units to let them know when to release their inmates and he would stand at the gate and monitor the inmates passing through to control their movement so that there were not too many at once, he made sure their identification badges were displayed, and he looked for contraband and other items not allowed in the yard. Cox testified that up to 400 inmates might go to recreation within a 10-minute period, and on top of monitoring them as they passed by occasionally he would randomly pat search an inmate. Cox stated that after all inmates entered the recreation yard, he would close the gate and only allow through those with passes. According to Cox, he could see most of the north recreation yard from the north tie shack and sometimes he would also walk around and monitor the area outside the shack. Cox related that in addition to camera surveillance, there was a recreation officer posted in the north recreation yard and two yard officers posted nearby.

{¶32} Cox stated that he knew nothing about Williams but was familiar with Hall, whom he described as arrogant, although he never issued Hall a conduct report for any infraction. On the morning of the fatal altercation, Cox stated, after the inmates came for recreation and he shut the gate, he was standing at the gate checking passes when he looked over and saw an inmate, who turned out to be Williams, on his hands and knees, and the yard became quiet. As Cox recalled, the yard officers were not in the immediate area and Corrections Officer Secrest was in the gymnasium. Cox explained that at first he thought Williams might have been having a medical emergency. But Cox stated that as he began walking that way and got a little closer, he saw Hall underneath Williams so he quickened his pace and radioed for assistance. Cox testified that he

was "kind of hopping" toward them rather than running because he underwent a knee replacement a few months earlier and only recently returned to work.

{¶33} According to Cox, Williams shouted that there was a shank, but it appeared Williams had Hall pinned down and he did not see either man do anything to the other. Cox stated that Secrest arrived first and gave oral commands with his OC canister drawn. Williams rolled off Hall, who was bloody, Cox stated, and at first it appeared Hall might have been stabbed. Hall got up and threw the weapon into the grass and then got on the ground and was compliant, Cox recalled. Cox testified that with Secrest in control of Williams and Hall, he went to secure the weapon because inmates were all around and he did not want any of them to get it. Cox stated that after Lieutenant Hall and others arrived, inmate Hall was escorted out and the yard was cleared so an ambulance could reach Williams. Regarding the source of the weapon, Cox stated with little explanation that he was "assuming" it came from a light fixture but that "[i]t is just a guess."

{¶34} Plaintiff's expert, Roy Timothy (Tim) Gravette, testified by way of deposition.[7] (Plaintiff's Exhibit 28.) Gravette testified that he began working for the Federal Bureau of Prisons in 1990 as a corrections officer and rose through the ranks to eventually serve as associate warden of three different institutions before retiring in 2010, and beyond his high school education he described receiving training at the Federal Law Enforcement Training Center and elsewhere during his career. Gravette explained that even though he worked for the federal government rather than defendant, in general all correctional systems follow the same standards set by the American Correctional Association.

---

[7]The objections in the deposition transcript at pages 17-18, 19/line 21, 23-24, 28-40, 42-43, 44/line 8, 46, 49-50, 52-55, 57-66, 67/lines 8 & 12, 69/line 24, 70-74, 76-79, 82/line 9, 83-84, 86-88, 91/line 24, 95-96, 99-105, and 107-108 are OVERRULED; the objections at pages 19/line 10, 20-22, 25-27, 44/line 20, 45, 67/line 24, 68, 69/line 12, 82/line 17, 85, 89-90, and 91/line 4 are SUSTAINED.

{¶35} In Gravette's opinion, the injury to Hall discovered on May 24, 2011, was not investigated properly in that there should have been more done to determine its cause after Hall gave inconsistent explanations. Gravette admitted, though, that inmates normally do not tell the truth about how they got hurt. Gravette stated that, at a minimum, interviews should have been conducted of Davis, Hall, and Williams, as well as their cellmates and associates, and corrections officers who worked in the housing unit. Gravette cited the fact that inmate Kimball Kenaga shared information with investigators after the fatal altercation as proof that inmates were willing to talk, yet he did not explain how this shows that inmates were willing to talk earlier about Hall's head injury. Gravette admitted that sometimes inmates just will not talk and that there are several reasons why that may happen, including avoiding exposing their own illicit behavior, a desire to avoid retribution, a preference for self-help, a reluctance or unwritten code among inmates to not cooperate or talk to authorities, or simple defiance.

{¶36} According to Gravette, Powers should have made notes during his investigation into Hall's injury and passed on a conclusion to supervisory staff. Gravette opined that Powers did not perform a proper investigation, or at least he had not seen documentation to demonstrate that. In Gravette's view, when it is suspected that an inmate has been in an altercation, something should always be done, even if it is just having a conversation with those believed to be involved. As Gravette acknowledged, a conversation like that would not always be documented, and, more broadly, he admitted that despite his various criticisms in this case he cannot identify any written policy that was violated. Gravette admitted that defendant had policies in place whereby Williams could have requested protection, and also that Williams himself could have avoided the fatal altercation. Nevertheless, Gravette opined, a proper investigation should have led officials to "err on the side of caution" and order a more effective local or institutional separation, although he gave little explanation as to what officials knew or should have

known to support such a decision.  Gravette also suggested that Hall could have been kept in segregation, but he did not explain how long Hall should have remained there and he admitted that every institution he worked in faced a high demand for that sort of special housing.

{¶37} Regarding shanks, Gravette testified that they cannot be eliminated entirely and that despite best efforts of prison staff, sometimes they are used.  Gravette explained that inmates are creative in making and hiding shanks.  Gravette stated that in his experience, weapons would be found about once or twice a week in the institutions where he worked.

**LAW**

{¶38} "To establish negligence, a plaintiff must show the existence of a duty, a breach of that duty, and injury resulting proximately therefrom."  *Taylor v. Ohio Dept. of Rehab. & Corr.*, 10th Dist. Franklin No. 11AP-1156, 2012-Ohio-4792, ¶ 15.  "In the context of a custodial relationship between the state and its prisoners, the state owes a common-law duty of reasonable care and protection from unreasonable risks."  *Jenkins v. Ohio Dept. of Rehab. & Corr.*, 10th Dist. Franklin No. 12AP-787, 2013-Ohio-5106, ¶ 8.  "The state's duty of reasonable care does not render it an insurer of inmate safety." *Allen v. Ohio Dept. of Rehab. & Corr.*, 10th Dist. Franklin No. 14AP-619, 2015-Ohio-383, ¶ 17, citing *Williams v. S. Ohio Corr. Facility*, 67 Ohio App.3d 517, 526 (10th Dist.1990).  Inmates must also use reasonable care to ensure their own safety. *Feathers v. Ohio Dept. of Rehab. & Corr.*, 10th Dist. Franklin No. 16AP-588, 2017-Ohio-8179, ¶ 18.  "'Reasonable care is that degree of caution and foresight an ordinarily prudent person would employ in similar circumstances.'"  *Literal v. Dept. of Rehab. & Corr.*, 10th Dist. Franklin No. 16AP-242, 2016-Ohio-8536, ¶ 15, quoting *McElfresh v. Ohio Dept. of Rehab. & Corr.*, 10th Dist. Franklin No. 04AP-177, 2004-Ohio-5545, ¶ 16.

{¶39} "The law is well-settled in Ohio that ODRC is not liable for the intentional attack of one inmate by another, unless ODRC has adequate notice of an impending

assault." *Watson v. Ohio Dept. of Rehab. & Corr.*, 10th Dist. Franklin No. 11AP-606, 2012-Ohio-1017, ¶ 9, citing *Mitchell v. Ohio Dept. of Rehab. & Corr.*, 107 Ohio App.3d 231, 235 (10th Dist.1995), citing *Baker v. State, Dept. of Rehab. & Corr.*, 28 Ohio App.3d 99 (10th Dist.1986). "Notice may be actual or constructive, the distinction being the manner in which the notice is obtained rather than the amount of information obtained." *Lucero v. Ohio Dept. of Rehab. & Corr.*, 10th Dist. Franklin No. 11AP-288, 2011-Ohio-6388, ¶ 18. "Whenever the trier of fact is entitled to find from competent evidence that information was personally communicated to or received by the party, the notice is actual. Constructive notice is that notice which the law regards as sufficient to give notice and is regarded as a substitute for actual notice." *Hughes v. Ohio Dept. of Rehab. & Corr.*, 10th Dist. Franklin No. 09AP-1052, 2010-Ohio-4736, ¶ 14.

**ANALYSIS**

{¶40} Upon review of the evidence presented at trial, the magistrate finds as follows. On May 24, 2011, Williams and Hall had an altercation in a cell in the housing unit where they lived. The altercation occurred after Williams got caught with hooch and then held Hall responsible, accusing him of having tipped off the corrections officers. During the altercation, Williams rammed Hall's head into a bedpost, splitting open Hall's scalp. Williams had no visible injuries. When a corrections officer later saw the wound, Hall explained that he had injured himself accidentally. The officer notified Lieutenant Powers and when Powers came to see Hall he got a slightly different explanation, and after sending Hall to the infirmary for medical attention, Powers decided to investigate and place Hall under security control in the segregation unit for his own safety, suspecting that Hall had been injured in an altercation. Powers prepared a Report of Security Control that was sent to the deputy warden and he notified the supervisor of the next shift.

{¶41} Over the next two days, inmates Davis and Williams were also placed under security control in the segregation unit on suspicion of having some connection

with Hall's injury. Powers met separately with Davis, Hall, and Williams multiple times and he also talked to other inmates, including Williams and Hall's cellmates, as well as corrections officers who worked in their housing unit. Williams told Powers he had no involvement with Hall and indeed no one said what really happened. Neither Williams nor Hall expressed to Powers or any other employee a fear of the other, nor a desire to be separated from one another or to be placed in protective control.

{¶42} Although some inmates knew about Williams and Hall's altercation and underlying dispute, no one shared that knowledge with staff other than Lieutenant Yates being told that the two had argued. Powers suspected Hall had been injured by another inmate and he held Hall in security control for as long as permissible, but due to inmates refusing to talk he could not obtain enough information to charge anyone with a rules infraction for injuring Hall. Formal separations of inmates normally come from the Rules Infraction Board, which was not involved here because no one was charged, nor was a request made by Williams or Hall for protective control, nor did officials have facts that would substantiate such a request, which requires a "verified" risk of harm. Still, as a precaution, Powers placed the three detained inmates in separate housing units, with Williams being placed in housing unit 2-B on May 31, 2011, Davis being returned to housing unit 1-A on May 31, 2011, and Hall being placed in housing unit 3-B on June 8, 2011.

{¶43} After being separated, Williams and Hall still saw one another in the chow hall, where Williams repeatedly made threatening statements and gestures, insisting that Hall compensate him to settle the dispute. Hall was also approached by other inmates whom he understood to be passing along messages from Williams, including a note directing him to either pay up or be met with more violence. Hall may have had some headphones stolen and suspected Williams was responsible, but there is no evidence that he threatened Williams over it, much less that prison authorities knew of any such threat.

{¶44} There was a posted, rotating schedule for when the different housing units were released for recreation such that Williams and Hall's housing units could sometimes be at recreation at the same time, and apparently the first time that they were both in the north recreation yard together following their initial altercation was on June 27, 2011. At about 8:15 a.m. on that date, very soon after the north recreation yard opened, Williams approached Hall near the basketball courts and made threatening gestures. Williams threw a punch and attacked Hall, who initially backed away, but Williams threw more punches and the two became involved in a struggle and quickly ended up on the ground. Amidst the struggle, Hall stabbed Williams three times, once in the neck, once in the torso, and once in the cheek, with a thin sharpened piece of metal about 9.5 inches long.

{¶45} Roughly one minute after the altercation began, Corrections Officer Cox observed from his post at the north tie shack what appeared to be an inmate down on all fours, possibly having a medical emergency. Cox proceeded toward the inmate, saw Hall beneath Williams, realized there was a struggle, and immediately radioed for assistance. Corrections Officer Secrest ran from the adjacent gymnasium and arrived at the scene just ahead of Cox. The inmates separated pursuant to Secrest's directives, less than 90 seconds after the altercation began. Hall threw the weapon out of the area and got on the ground. As Cox went to recover the weapon, Secrest summoned medical assistance and attempted to stanch the wound on Williams' neck or otherwise render aid as shown in the video footage. Less than 30 seconds after Secrest and Cox got to the scene, Lieutenant Hall arrived, followed by several more responders. Staff cleared the yard and medical responders came to treat Williams and transport him to an outside hospital.

{¶46} Even though Cox could not run to the scene, his response in radioing for assistance was immediate and resulted in Secrest, close by in the gymnasium, getting to the scene very quickly, and the evidence tends to show that even if Cox had been

able to run, it would not have made a difference.  From the testimony of Cox and inmate Bliss, together with the video, it appears that by the time Cox saw Williams and started heading toward him, the stabbing had already occurred and Williams was holding Hall down.

{¶47} The greater weight of the evidence establishes that defendant did not have sufficient notice, actual or constructive, to be liable for the fatal injuries that Williams sustained.  There is no credible evidence that Hall ever threatened to harm Williams, much less that Williams or anyone else told prison staff that one or the other was in danger.  Williams was the one perpetuating the dispute, and to notify staff of a problem would effectively have been to reveal his own misconduct in attempting to extort payment from Hall under a threat of violence.  When investigating the injury Hall sustained on May 24, 2011, Powers specifically asked Williams about any involvement he had with Hall, but Williams lied and denied having anything to do with Hall.

{¶48} In arguing that defendant had notice sufficient to render it liable for Williams' death, plaintiff compares the facts of this case with those in *Frash v. Ohio Dept. of Rehab. & Corr.*, 10th Dist. Franklin No. 14AP-932, 2016-Ohio-360, where it was determined that defendant had constructive notice that an inmate named Groves, a paranoid schizophrenic with an extensive history of stabbing other inmates, would attack another inmate, even though defendant lacked information about whom exactly Groves would attack.  *Frash* is factually distinguishable, however.  Among other things, Hall did not have mental health issues like Groves, and while there is evidence that over the course of 19 years in prison Hall had been in an altercation in which he struck another inmate in the head with an object in 2004 and was involved in relatively minor fights with inmates in 2008 and 2009 (Plaintiff's Exhibits 5, 19-12, 19-13), Groves had a far more violent and troubling record dating back to 1984 of attacking other inmates with cutting or stabbing weapons, with one incident resulting in an attempted murder conviction.  Plaintiff points out that Hall was serving time for murder and had been at the

maximum security Southern Ohio Correctional Facility from 2005 until transferring to RCI in 2007, but RCI is a level three prison, just one step below the Southern Ohio Correctional Facility, and is populated by many violent offenders. Williams himself had been in prison for more than eight years and spent more time at the Southern Ohio Correctional Facility than Hall, from 2005 until 2011, transferring to RCI only months before the fatal altercation. (Plaintiff's Exhibits 10, 11.) Plaintiff, portraying Hall as the more violent or dangerous inmate, asserts that Williams lived in a housing unit "one level below the 'honor dorm'" when he died, but they lived in the same unit until Powers separated them and neither lived in the honor dorm. Moreover, Williams was younger and much larger than Hall and muscled others around through his work with Wilford and the underground store.

{¶49} Plaintiff attaches significance to testimony by Wilford that he had an agreement with corrections officers to settle disputes "in house" if no weapon was involved, but clearly the officer who discovered Hall's injury on May 24, 2011, did not leave it up to the inmates and instead reported it to a supervisor, and Powers and others got involved and pulled inmates out of the housing unit to investigate. Plaintiff is critical of Powers' actions, arguing that he did not conduct an investigation or at least not a proper one, that he should have prepared an incident report, and that he should have separated Williams and Hall to a greater degree so that they could not see each other. But Powers' testimony credibly established that he conducted a reasonable investigation, even if he did not keep his notes afterward, but despite his efforts no one shared any meaningful information. Regardless of whether Powers prepared an incident report, he still documented Hall's injury in a Report of Security Control which was copied to the deputy warden, and it is difficult to see how an incident report on top of that, containing the same basic information, would have made any material difference, i.e., resulting in defendant learning additional information that would have required it to take further action to protect Williams. Plaintiff argues that Powers should

have searched Williams and Hall's property to look for notes between them, but only later, after they got out of segregation, did Williams send Hall one or more threatening notes, and there is no evidence that Hall ever sent Williams a note.

{¶50} In *Baker*, 28 Ohio App.3d at 100, defendant still lacked adequate notice of an inmate's assault where the inmate, in contrast to Williams' silence or denials in this case, had at least made vague statements to guards that he needed to be moved off the range but did not request protective control or express fear of an impending assault. Here, Williams did not request protective control, he did not express fear of an impending assault, and neither he nor anyone else provided the kind of information that Powers sought in his investigation. Instead, Williams falsely claimed to have nothing to do with Hall. The decision by Powers when releasing Williams, Hall, and Davis from segregation, placing them in separate housing units, was reasonable based upon the available information. Even if Powers suspected that Williams was somehow involved in injuring Hall, it was not adequate notice of an impending attack against Williams. It is challenging to think that Powers would have a duty, based on a mere suspicion of Williams' past misconduct in injuring Hall, to take further action to essentially protect Williams from his own future misconduct in going on to extort Hall under a threat of violence and ultimately attacking Hall. In *Mitchell*, 107 Ohio App.3d at 234, an inmate, Mitchell, with a history of extorting other inmates with sexual violence made a threat to rape another inmate, Ross, and repeatedly pressured Ross for sex over a period of two or three weeks. Mitchell sued defendant for injuries he suffered when Ross assaulted him with a steel pipe while he slept. *Id.* Mitchell essentially claimed, unsuccessfully, that defendant should have known an assault was impending given his own predatory behavior. *Id.* at 235. Here, plaintiff claims that defendant should have foreseen not only that another inmate would injure Williams following future threats and pressure by Williams, but that it would occur in an attack that he himself launched.

{¶51} On another matter, plaintiff is critical of the way that inmates were monitored as they entered the yard for recreation, arguing in part that there should have been more pat searches of inmates. It was a formal, written departmental policy, however, that the corrections officer posted at the north tie shack needed to perform six pat searches during his or her shift. Inmates would come and go through the north tie shack all day long, and the searches did not need to all be performed specifically when inmates entered the yard for recreation. Plaintiff also argues that corrections officers lacked training in how to monitor inmates, pointing to the fact that Cox stated that spotting suspicious behavior was a skill that corrections officers acquired on the job. Skills like these that Cox developed over many years of experience, however, do not mean that he was not properly trained. The testimony of Cox and others established that defendant did train its staff and it was not shown that Cox did anything improper in the way that he monitored the inmates entering the yard. Plaintiff makes some general criticisms about the level of surveillance in the yard, and points out that there had previously been a reduction in staff at RCI, but mere statements like these do not establish negligence and plaintiff failed to show that defendant fell below the standard of care. *See Lucero*, 2011-Ohio-6388, at ¶ 22. Plaintiff appears to suggest that the long-sleeved shirt worn by Hall, under which he could have concealed the weapon and the plastic tied around his wrist, should have drawn Cox's suspicion, but recreation occurred early in the morning and indeed the video shows that Williams also wore a long-sleeved shirt. Plaintiff offered some evidence and arguments to the effect that inmates should have been subjected to metal detectors every time they went to recreation, but judgment on the pleadings was granted for defendant on any such claim in the entry of October 12, 2016. (The entry also granted judgment for defendant regarding any claim arising from the prison not being put on lockdown after an unrelated gang fight on June 26, 2011.)

{¶52} Additionally, plaintiff's expert asserted that the weapon used in the altercation was made from a light fixture component, and plaintiff contends that defendant knew weapons were being made from such components and negligently failed to remediate the light fixtures. But, the evidence failed to establish what the weapon was made from, and to attribute the weapon to a light fixture component is purely speculative. Warden Jeffreys, who acknowledged that some weapons found at RCI had been made from a light fixture component, could not remember seeing another weapon that looked like this one, and Investigator Baker speculated that it came from an entirely difference source. Plaintiff raises criticisms about prison officials not searching the yard more often for buried weapons or otherwise not effectively ferreting out weapons, but defendant had procedures in place to perform shakedowns and look for weapons, it was not established that there were any deviations from defendant's policies on searching for weapons in the yard or elsewhere, and there is no credible evidence that the shank used in the altercation had been buried or hidden in the yard. While plaintiff argued that prison officials should have performed intensive "operational clear-outs" more often to look for weapons, these were shown to be large-scale operations that involve large numbers of staff from multiple prisons, requiring significant time, effort, and coordination, and decisions about the frequency with which they were performed are subject to discretionary immunity. *See Hughes*, 2010-Ohio-4736, ¶ 16, quoting *Reynolds v. State*, 14 Ohio St.3d 68, 70 (1984) ("The discretionary immune doctrine "provides that 'the state cannot be sued for its legislative or judicial functions or the exercise of an executive or planning function involving the making of a basic policy decision which is characterized by the exercise of a high degree of official judgment or discretion.'").

{¶53} Finally, although the magistrate sympathizes with the loss suffered by Williams' family, even if plaintiff had proven some negligence on the part of defendant, Williams' contributory fault would be greater in degree than any fault attributable to

defendant, thus barring plaintiff from recovering damages. *See* R.C. 2315.33. Having already battered Hall once before and then making repeated, extortionary threats of further violence, it was Williams who followed through and launched an attack upon Hall on June 27, 2011. Plainly, Williams prompted and could have reasonably avoided the altercation. By failing to do so, he did not exercise reasonable care for his own safety. In *Williams*, 67 Ohio App.3d at 526, an inmate, Williams, had an ongoing dispute with another inmate, Lorraine. Williams approached Lorraine's cell and attempted to strike Lorraine, and in the altercation Williams was allegedly poked in the eye and injured. It was held that Williams was contributorily negligent by choosing to put himself within reach of Lorraine and attempting to strike Lorraine. Here, inmate Williams was contributorily negligent in pressuring, threatening, and attacking Hall.

**CONCLUSION**

{¶54} Based on the foregoing, the magistrate finds that plaintiff failed to prove his claim by a preponderance of the evidence. Accordingly, judgment is recommended in favor of defendant.

{¶55} *A party may file written objections to the magistrate's decision within 14 days of the filing of the decision, whether or not the court has adopted the decision during that 14-day period as permitted by Civ.R. 53(D)(4)(e)(i). If any party timely files objections, any other party may also file objections not later than ten days after the first objections are filed. A party shall not assign as error on appeal the court's adoption of any factual finding or legal conclusion, whether or not specifically designated as a finding of fact or conclusion of law under Civ.R. 53(D)(3)(a)(ii), unless the party timely and specifically objects to that factual finding or legal conclusion within 14 days of the filing of the decision, as required by Civ.R. 53(D)(3)(b).*

ROBERT VAN SCHOYCK
Magistrate

**Filed April 27, 2018**
**Sent to S.C. Reporter 5/4/18**